**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 23 2000**

**PATRICK FISHER**
**Clerk**

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

KEVIN L. KING,

        Defendant-Appellant.

No. 99-3275

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 98-CR-40035)

Melody Evans, Assistant Federal Public Defender, (David J. Phillips, Federal Public Defender for the District of Kansas, Topeka, Kansas, with her on the briefs), for Appellant.

Randy M. Hendershot, Assistant United States Attorney, (Jackie N. Williams, United States Attorney, and Nancy Landis Caplinger, Assistant United States Attorney, Topeka, Kansas, on the brief), for Appellee.

Before **SEYMOUR,** Chief Judge, **HENRY,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

The primary issue in this case is whether police officers violated the Fourth Amendment when they executed a search warrant, which authorized the seizure of only the defendant himself, by knocking on the defendant's door and, upon his opening the door, simultaneously announcing their presence and tackling him back into his home. The defendant also challenges the constitutionality of a protective sweep which the officers conducted subsequent to the defendant's seizure. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court concludes the manner in which the officers effectuated the search and seizure was reasonable under the Fourth Amendment. We further conclude that even if the protective sweep violated the Fourth Amendment, a question we do not decide, no suppression consequences flow from the purported illegality. This court therefore **affirms** the district court's denial of the defendant's motion to suppress evidence.

## II. BACKGROUND

In the Fall of 1998, Detective Mike McAtee of the Lawrence, Kansas Police Department received information from "people on the street" that two men known as "Black" and "Red" were selling drugs in Lawrence. On October 28, a confidential informant, who proved reliable in the recent past, told Detective

McAtee of a specific residence at 1206 Pennsylvania from which "Black" was selling narcotics. The confidential informant stated that several weeks earlier when she and her boyfriend went to that residence to purchase drugs, "Black" had threatened her boyfriend with a gun.

From officers at the Leavenworth and Atchison Police Departments, Detective McAtee learned that Kevin King went by the street name of "Black" and that one of King's associates, Kevin Jones, went by the street name of "Red." An Atchison police officer also informed Detective McAtee that there was an outstanding arrest warrant for King's failure to appear to be sentenced on felony drug charges involving a weapon. Finally, Detective McAtee learned that King and Jones were gang members known to carry firearms.

On November 3, undercover officer Rodney Chamberlain knocked on the back door of the house at 1206 Pennsylvania and inquired about buying drugs. When the man inside replied that he did not know what Chamberlain was talking about, Chamberlain left. Chamberlain did, however, identify the man inside as King, based on a photograph of King he had previously viewed. That same day, relying on the outstanding arrest warrant, the confidential informant's information, and officer Chamberlain's identification of King during the attempted controlled buy, the police obtained a warrant to search the residence at 1206 Pennsylvania, though the warrant only authorized a seizure of King himself.

That evening, Officer Terry Haak knocked on the back door of the home at 1206 Pennsylvania. When King opened the door, Haak announced "police, get down" and simultaneously, he and another officer knocked King to the floor inside the kitchen of his home.[1] As the two officers and King slid across the kitchen floor, Haak felt a heavy, metallic object strike his leg and subsequently noticed a loaded magazine clip from a weapon on the floor. Numerous additional officers then entered the residence to conduct a protective sweep of the home. Detective McAtee also entered to identify King and explain that he had a search warrant authorizing King's seizure. Upon entering the kitchen, Detective McAtee observed in plain view a handgun sitting on a baker's rack two to three feet from the point of entry and crack cocaine on a plate in the kitchen. When King asked Detective McAtee to retrieve a coat from his bedroom, Detective McAtee walked to the bedroom and, in the process, observed marijuana on the arm of a couch in the "front room." At that time, however, the officers only seized King himself and left the contraband in the residence.

Based on the information obtained prior to and during the execution of that first search warrant, the officers procured a second warrant authorizing the seizure of weapons, ammunition, drugs, and other items establishing ownership or control over the residence at 1206 Pennsylvania. In the early morning hours of

----

[1] The back door of the home opened directly into the kitchen.

November 4, the officers returned to King's home and seized three weapons, ammunition, narcotics, drug paraphernalia and numerous other items. King also made several incriminating statements during an interrogation at the police station.

King was indicted on three counts: (1) possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1); (2) knowingly and intentionally carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1); and (3) possession of a firearm by a felon, *id.* § 922(g). King moved to suppress all the evidence found at his home and his statements. At the close of the suppression hearing, the district court denied the motion, making no findings of fact but stating, "the officers of the police department in Lawrence . . . acted reasonably under the circumstances for the safety of the officers and all those other persons who were present. That's a specific finding of the Court." King then entered a conditional guilty plea to the count of carrying a firearm during a drug trafficking crime, reserving the right to appeal the district court's suppression ruling. The district court sentenced King to five years' imprisonment followed by three years of supervised release.

## III. DISCUSSION

### A. Standard of Review

In assessing a challenge to a district court's denial of a motion to suppress evidence, this court reviews *de novo* the question of reasonableness under the Fourth Amendment. *See United States v. Broomfield*, 201 F.3d 1270, 1273 (10th Cir. 2000). If the district court fails to make findings of fact, as occurred here, we may uphold its ruling "if there is any reasonable view of the evidence to support it."[2] *Id*.

## B. Seizure of the Defendant

---

[2]Relying on *United States v. Soria-Garcia*, 947 F.2d 900, 902 n.1 (10th Cir. 1991), King argues that because he specifically asked the district court to make factual findings and it declined to do so, this court must review the facts *de novo*. *Soria-Garcia*, however, does not stand for this proposition. The *Soria-Garcia* court merely employed a *de novo* standard to review the legal question of whether a *Miranda*-like warning was deficient. *See id.*

It is true that the district court bears the responsibility to make on-the-record findings of fact "[w]here factual issues are involved in determining a motion." Fed. R. Crim. P. 12(e). Moreover, when the district court fails to meet that obligation and the record from the district court proceedings "is insufficiently developed regarding the suppression issue" to allow this court to resolve an appeal, a remand for further factual findings is the appropriate remedy. *United States v. Ramstad*, No. 99-3277, 2000 WL 1059403, at *2 (10th Cir. Aug. 2, 2000). The record in the instant case, however, is sufficiently detailed and developed to avoid the need for remand. As this court has sometimes stated, therefore, we will affirm the district court's suppression ruling if any reasonable view of the evidence supports that ruling. *See, e.g., United States v. Broomfield*, 201 F.3d 1270, 1273 (10th Cir. 2000); *United States v. Gonzalez-Acosta*, 989 F.2d 384, 387 (10th Cir. 1993); *United States v. Cooper*, 733 F.2d 1360, 1364 (10th Cir. 1984). Nonetheless, this court once again reminds the district court to make on-the-record findings of fact when it is required to do so. *See, e.g., Ramstad*, 2000 WL 1059402, at *2; *United States v. Gigley*, 213 F.3d 509, 513 n.1 (10th Cir. 2000).

King argues the district court erred in denying his suppression motion because all the evidence which the police seized from his home and incriminating statements he made about that evidence resulted from an unconstitutional entry into the home. He concedes that the officers arrived at his house armed with a warrant which authorized the seizure of his person. King contends, however, that once he opened the door of his home and presented himself to the officers, they were required to seize him immediately at the threshold to his home. He thus argues that the officers exceeded the scope of their search warrant in violation of the Fourth Amendment by tackling him back into his kitchen and conducting a protective sweep of the home. The proper characterization of the issue presented, however, is whether the manner in which the officers effectuated King's seizure was reasonable under the Fourth Amendment. If the officers acted reasonably in tackling King back into his kitchen, their entrance into his kitchen was permissible and anything which they then observed in plain view in the kitchen was properly utilized to obtain the second search warrant. *See Washington v. Chrisman*, 455 U.S. 1, 5-6 (1982) (holding that the plain view doctrine "permits a law enforcement officer to seize what is clearly incriminating evidence or contraband when it is discovered in a place where the officer has a right to be"); *United States v. Blount*, 123 F.3d 831, 839 n.6 (5th Cir. 1997) (en banc) (noting

that items legally observed in plain view may be referenced in an affidavit to obtain a search warrant).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quotations omitted). We employ this balancing test to resolve the ultimate inquiry of whether, in light of the facts and circumstances confronting the officers who seized King, the manner in which they effectuated that seizure was objectively reasonable.[3] *See id.* at 397.

It is well settled that an individual's Fourth Amendment interest in freedom from governmental intrusion into the home is particularly strong, as this interest is rooted in the very language of the Fourth Amendment. *See Payton v. New York*, 445 U.S. 573, 589-590 (1980)*; Silverman v. United States*, 365 U.S. 505,

---

[3]King contends that the search was unconstitutional because the actual motive of the officers in tackling King was to gain access to his home to search for contraband when they did not have sufficient information to obtain a search warrant for such contraband. Because the standard is one of objective reasonableness, we reject this argument. As the Supreme Court stated in *Graham v. Connor*, "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, *without regard to their underlying intent or motivation*. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." 490 U.S. 386, 397 (1989) (emphasis added).

511 (1961). In *Payton*, the Supreme Court suggested that interest is at its height when a governmental intrusion into the home occurs without a warrant. *See id.* at 590 ("Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). In this case, however, the officers who seized King by tackling him back into his home did so with a search warrant in hand authorizing entry into that very residence. Additionally, the Supreme Court has recognized that individuals possess a Fourth Amendment interest in bodily integrity. *See Winston v. Lee*, 470 U.S. 753, 760 (1985). In measuring the nature and quality of the officers' intrusion on King's Fourth Amendment interests, therefore, we note that the officers used only that amount of force against King's person which was necessary to quickly immobilize him.

This court must determine whether that intrusion is outweighed by the countervailing governmental interests at stake–in this case, the safety of the officers effectuating the seizure. The facts and circumstances known to those officers at the time they executed the first search warrant would have caused a reasonable officer significant concern that an attempt to seize King could be fraught with danger. Prior to the seizure, the officers had information that King and an associate named Kevin Jones were selling drugs from the residence on 1206 Pennsylvania. Additionally, they had been informed by other police officers that Jones and King were gang members known to carry firearms. The officers

also discovered King was the subject of an outstanding arrest warrant for failure to appear at sentencing on a felony conviction involving weapons. Finally, a reliable confidential informant had disclosed to the Lawrence officers that several weeks before King's seizure, when she and her boyfriend went to King's residence to purchase drugs, King had threatened her boyfriend with a gun. Prior to effectuating the seizure of King, therefore, the officers had information that King possessed a firearm in his home, that he had displayed a willingness to use that firearm, and that his associate Jones might also be inside the home armed with a weapon. Given this information, the executing officers had a substantial interest in seizing King in a manner which neutralized the definite safety risk inherent in their task. As the Supreme Court instructed in *Terry v. Ohio*, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." 392 U.S. 1, 23 (1968). On balance, therefore, the officers' interest in their own safety at the time of the seizure outweighed their intrusion upon King's Fourth Amendment interests.

King also argues that the manner in which the search was conducted violated the Fourth Amendment because the officers disregarded the "knock and announce" requirement articulated in *Wilson v. Arkansas* and instead announced their presence and identity as they simultaneously entered his home, depriving him of the opportunity to voluntarily admit the officers. *See* 514 U.S. 927, 931-

36 (1995). In *Wilson*, the Supreme Court did establish that "the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering." *Id.* at 931. Both the Supreme Court and this court have recognized, however, that "[o]fficers may . . . be excused from the usual 'knock and announce' rule if exigent circumstances attended the search." *United States v. Moore*, 91 F.3d 96, 98 (10th Cir. 1996); *see also Wilson*, 514 U.S. at 936 ("[A]lthough a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry."); *Richards v. Wisconsin*, 520 U.S. 385, 391-92 (1997).

As the discussion above suggests, the government has demonstrated that exigent circumstances did attend the search of King's home, because the officers harbored "a reasonable suspicion that knocking and announcing their presence, under the circumstances, would be dangerous . . . ." *Richards*, 520 U.S. at 394. This is not a case, as in *Moore*, in which the only evidence of exigency was the presence of firearms. *See* 91 F.3d at 98. The government presented further evidence that King was violent, that he had previously displayed a willingness to use his gun, and that another suspected drug dealer might be present in King's home with a weapon in his possession. The government thus met the *Moore*

court's demand that it "demonstrate that the presence of firearms raised a concern for the officers' safety." *Id.*

Because the officers' tackling of King into his home and their simultaneous announcement and entry were objectively reasonable, they were legally present in the home when they observed in plain view the contraband upon which they relied to obtain the second search warrant. The evidence ultimately seized in that second search and any statements King made concerning the observed contraband, therefore, need not be suppressed due to the manner in which the officers effectuated King's seizure.

## C. The Protective Sweep

King argues that his suppression motion should have been granted because the protective sweep conducted by the police officers subsequent to his seizure was unreasonable under the Fourth Amendment. The only relevant item discovered during that sweep was a shotgun, though the officers waited until the execution of the second search warrant to actually seize the shotgun. Because no evidence was recovered during the protective sweep, King must be arguing that the evidence he sought to suppress constitutes fruit of the allegedly illegal sweep. In *United States v. Nava-Ramirez*, this court stated that under the fruit of the poisonous tree doctrine, the defendant bears the burden of "proving a factual nexus" between the Fourth Amendment violation and the seizure of the evidence

-12-

sought to be suppressed. 210 F.3d 1128, 1131 (10th Cir. 2000). In the instant case, the affidavit submitted to obtain the second search warrant did not even reference discovery of the shotgun during the protective sweep; it merely stated that after being issued *Miranda* warnings, King himself disclosed the shotgun's presence in the home. Moreover, the record does not indicate that King's admission about the shotgun was prompted by an officer's question specifically concerning the shotgun.[4] Even if this court assumes that the protective sweep violated the Fourth Amendment, therefore, King failed to meet his burden of establishing a factual nexus between the sweep and either the evidence seized during the second search or his own incriminating statements. This court thus rejects King's argument that his suppression motion should have been granted because of the nature of the protective sweep.

## IV. CONCLUSION

---

[4]Even if King's statement about the shotgun did result from police questioning about that particular weapon, thus revealing that the affidavit used to obtain the second search warrant did rely on information gathered during the protective sweep, this court would affirm the denial of King's suppression motion. In reviewing the district court's decision, "we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause." *United States v. Cusamano*, 83 F.3d 1247, 1250 (10th Cir. 1996) (en banc). Absent the reference to the shotgun in the affidavit used to obtain the second search warrant, the balance of the affidavit still established probable cause to search King's home.

This court concludes the manner in which the officers effectuated King's seizure was reasonable under the Fourth Amendment. Additionally, even if the subsequent protective sweep violated the Fourth Amendment, that violation would not lead to suppression of any evidence. We therefore **AFFIRM** the ruling of the United States District Court for the District of Kansas denying King's motion to suppress all evidence obtained as a result of the execution of the first search warrant.